IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIMMY RODRIGUEZ,<br><br>        Plaintiff,<br><br>    v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>        Defendant.<br>_____ | Case No.: 1:09-cv-00380 OWW JLT<br><br>FINDINGS AND RECOMMENDATIONS DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>(Docs. 22, 23) |

Jimmy Rodriguez ("Plaintiff") asserts he is entitled to disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Toward this end, Plaintiff argues the administrative law judge ("ALJ") erred in finding one of his impairments was not severe and in finding that he was not compliant with treatment for his diabetes. Therefore, Plaintiff seeks judicial review of the administrative decision denying his claim for benefits. For the reasons set forth below, the Court recommends Plaintiff's appeal be denied.

### **PROCEDURAL HISTORY**[1]

Plaintiff filed applications for disability insurance benefits (AR at 67-71) and supplemental security income (AR at 193-98) on August 18, 2005, alleging disability beginning August 8, 2005.

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

The Social Security Administration denied his claims on December 29, 2005, and upon reconsideration on October 26, 2006. *See id.* at 15, 199-200. After requesting a hearing, Plaintiff testified before an ALJ on September 6, 2007. *Id.* at 201.

The ALJ determined Plaintiff was not disabled, and issued an order denying benefits on September 24, 2007. *Id.* at 15-21. Plaintiff requested review of the ALJ's decision by the Appeals Council of Social Security, which was denied on January 28, 2009. *Id.* at 4-6. Therefore, the ALJ's determination became the decision of the Commissioner of Social Security ("Commissioner").

On March 2, 2009 Plaintiff filed his Social Security Complaint and a motion to proceed *in forma pauperis*. (Docs. 1, 2). Pursuant to 28 U.S.C. § 1915(e)(2), the Court screened Plaintiff's Complaint, and dismissed Plaintiff's claim against Administrative Law Judge Bert C. Hoffman. (Docs. 7, 11). Plaintiff filed his Opening Brief on June 1, 2010. (Doc. 22). The Commissioner filed his responsive brief, a motion for summary judgment, on June 30, 2010. (Doc. 23).

**STANDARD OF REVIEW**

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938). The record as a whole must be considered, as "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

**DISABILITY BENEFITS**

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment

2

that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered disabled only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). When a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## DETERMINATION OF DISABILITY

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1994). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity[2] to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* In making these determinations, the ALJ must consider objective medical evidence and opinion (hearing) testimony. 20 C.F.R. §§ 416.927, 416.929.

A. Relevant Medical Evidence

According to treatment notes from EveryDay Health Care Family Medical Group ("EveryDay Health Care"), Plaintiff injured his knee on April 26, 2004. *See, e.g.*, AR at 125. Other notes indicate that on July 3, 2004, Plaintiff also "sustained an injury to his left knee . . . when he turned and twisted his body." AR at 182. At the time, Plaintiff was treated at an industrial clinic, where he

---

[2] The residual functional capacity is a determination of what a claimant "can still do despite [his] limitations." 20 C.F.R. § 404.1545. "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." *Massachi v. Astrue*, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007).

3

was given pain medication, and took a week off of work. *Id.* He then returned to work with modified duties that required lifting no more than ten pounds. *Id.* Plaintiff underwent an MRI study of his knee in late 2004, which revealed torn cartilage. *Id.* Plaintiff's attorney referred him to Dr. Bedikian at Advanced Rehabilitation and Pain Center, who referred Plaintiff to Dr. Michael Esposito for an orthopaedic evaluation. *Id.*

Treatment notes reveal that Plaintiff returned several times to EveryDay Health Care complaining about his knee in late 2004 and early 2005. On September 13, 2005, Plaintiff complained to staff at EveryDay Health Care that his knee was bothering him and that he had "discomfort at night." AR at 124. On September 24, 2004, the physician's report indicated that Plaintiff could "perform regular work duties . . . without restrictions." *Id.* at 139. On October 1, 2004, the physician limited Plaintiff to working eight-hour shifts, and diagnosed him with "internal derangement knee." *Id.* at 138. Plaintiff complained that his knee was "locking" and "swelling" on December 16, 2004. *Id.* at 136. At the follow-up appointment on December 23, 2004, Dr. Patrick O'Brien repeated the diagnosis of internal derangement knee and left knee sprain, had stated his objective findings were "within normal limits." AR at 131. Therefore, Dr. O'Brien opined that Plaintiff could return to work without limitations or restrictions. *Id.* On January 13, 2005, Plaintiff stated his left knee "pops by its self (sic) when working on feet 8 hours a day" but when he rests it "feels better." AR at 127. Plaintiff was taking Bextra and Vicodin at the time and indicated that the medication was helping. *Id.* Again the doctor concluded that Plaintiff could return to regular work duties without restrictions. *Id.* at 128.

Plaintiff saw Dr. Melchor Ong at Kaiser Permanente "to discuss getting his blood sugar in order and getting his [hernias] fixed" on August 16, 2005. AR at 119. Plaintiff reported that he wanted to "go on disability now" because his hernia "hurts too much for him to continue to work now." *Id.* Dr. Ong opined Plaintiff had a "different attitude" than his prior visits "regarding what he is willing to do to get his blood sugar under control." *Id.* In addition, Plaintiff reported that his vision was "less blurry in the mornings" since he started taking his medication. *Id.* Dr. Ong noted Plaintiff's "diabetes [was] poorly controlled." *Id.*

On November 19, 2005, Plaintiff underwent a consultative examination by Dr. Steven Stoltz. AR at 144-49. Plaintiff reported that doctors had not treated his diabetes "for a few years" and he was not on medication to treat it. *Id.* at 144. In addition, Plaintiff told Dr. Stoltz that he "was evaluated by a general surgeon and there was a plan to operate [on the bilateral inguinal hernias] but due to his blood sugar readings, that was cancelled." *Id.* On examination, Dr. Stoltz found Plaintiff "had quite significant bulging in both inguinal areas consistent with bilateral inguinal hernias." *Id.* at 147. With regard to his knee injury, Plaintiff complained of "pain along the lower patellar region, [which was] worse when . . . in a supine straight knee extension position." *Id.* at 144. Dr. Stoltz determined Plaintiff's extension and flexion were within normal limits for both knees and opined "he had good range of motion in both knees." *Id.* at 147-48. Further, Dr. Stoltz found Plaintiff's strength was "5/5 in all extremities." *Id.* at 148. Given the findings of his examination, Dr. Stoltz stated, "I would limit him to standing or walking two to four hours in a normal eight hour work day. He can sit without restriction. Lifting and carrying should be tolerable at 10 pounds on an occasional and frequent basis." *Id.* at 149.

Plaintiff underwent an MRI of his knee on December 1, 2005, upon the request of Dr. O'Brien. AR at 150. Dr. Matthew Iwamoto reviewed the results and opined that the MRI showed "mild thickening of the superficial lawyer of the medical collateral ligament with fluid surrounding the ligament." *Id.* In addition, Dr, Iwamoto stated:

> The anterior cruciate ligament is attenuated. The posterior cruciate ligament is somewhat stretched but intact. The medial meniscus is remarkable for an oblique tear of the posterior horn that reaches the inferior articular margin. The lateral meniscus is remarkable for intramensical degenerative change of the anterior and posterior horns. The areas of abnormal signal intensity do not unequivocally reach a meniscal surface.

*Id.* Plaintiff's quadriceps, patellar tendance, and lateral collateral tendon were all intact. *Id.* Dr. Iwamoto opined there was no evidence of gross knee effusion or a Baker's cyst. *Id.*

Dr. Brian Ginsburg reviewed Plaintiff's medical records completed a residual functional capacity assessment of Plaintiff on December 22, 2005.[3] AR at 151-58. Dr. Ginsburg opined that

---

[3] On October 23, 2006, Dr. Wesley Jackson reviewed Dr. Ginsburg's assessment and "affirmed it as written." AR at 158. In addition, Dr. Jackson "affirmed" the notations that Plaintiff "had yet to have his hernia repaired secondary to poor blood glucose control" and "the records demonstrate[d] he is largely non-compliant, [but his diabetes] has responded

Plaintiff could lift and carry up to twenty pounds occasionally and up to ten pounds frequently. *Id.* at 152. Also, Dr. Ginsburg found Plaintiff could, with normal breaks, stand or walk for six hours in an eight-hour day, and sit for about six hours. *Id.* Plaintiff was limited to "occasional" pushing/ pulling with his lower extremities, climbing, kneeling, and crouching. *Id.* at 152-53. However, Plaintiff could "frequently" balance, stoop, and crawl. *Id.* at 153. Dr. Ginsburg stated Plaintiff had no manipulative, visual, communicative, or environmental limitations. *Id.* at 154-55.

On December 6, 2005, Plaintiff sought treatment at Sequoia Community Health Centers ("Sequoia Community") for his inguinal hernias. AR at 176. As a result, he was referred to University Medical Center ("UMC"), where on January 19, 2006, Plaintiff complained of increased pain from his hernias and showed tenderness. *Id.* at 162. The treatment notes indicated Plaintiff was "not currently taking medications [or] checking blood glucose" and stated Plaintiff "need[ed] good [blood glucose]" prior to surgery for his hernias. *Id.* At Sequoia Community, it was noted that Plaintiff's diabetes was "out of control" on January 26, 2006. *Id.* at 174. Again on May 30, 2006, a physician noted Plaintiff had not been using insulin and the doctor demonstrated its use for Plaintiff. *Id.* at 171. On August 15, 2006, the physician noted Plaintiff was showing "poor compliance" with his medication. AR at 169. In October 2006, Plaintiff was responding "well" to his insulin, but still showed "poor control" over his diabetes. *Id.* at 165, 167. On October 9, 2006, Dr. Vasquez opined that Plaintiff needed to follow-up with a dietician and/or be referred to Adult Health at UMC. *Id.* at 166. On December 19, 2006, Plaintiff failed to keep is appointment with the "diabetic educator." *Id.* at 191.

Dr. Esposito, who began treating Plaintiff for his knee injury on February 14, 2006, completed a final orthopedic evaluation of Plaintiff on October 17, 2006. AR at 181-86. Dr. Espositio noted Plaintiff had exhibited "slow progressive improvement after having a video arthroscropy." *Id.* at 183. Upon physical examination of his left knee, Plaintiff showed "mild focal tenderness" over the lateral facet of the patella and over the posterior horn of the medial meniscus. *Id.* Plaintiff's range of motion was "from 5 to 125 degrees." *Id.* Plaintiff complained of "slight pain

---

temporarily when apparently compliant." *Id.* at 160.

in his left knee which becomes moderate with prolonged standing and walking," and he was "unable to squat or kneel and ha[d] difficulty with stair climbing." *Id.* at 185. Thus, Dr. Esposito opined that "it would appear to be medically reasonable to preclude this injured worker from heavy lifting (not over 25 pounds), prolonged standing or walking, and from squatting, kneeling, or stair climbing, in order to prevent the reasonably likelihood that such activities would markedly exacerbate or possibly aggravate his current condition."

On July 27, 2007, Plaintiff received treatment at UMC for the inguinal hernias. AR at 192. The treatment notes mentioned Plaintiff's January 2006 evaluation and noted that he was sent back to his primary care physician for assistance in controlling his diabetes before the surgery could be performed. *Id.* The treatment notes indicated Plaintiff was "non-complaint" with his diet and medication. *Id.*

B.  Hearing Testimony

Plaintiff testified at a hearing before the ALJ on September 6, 2007, at which time he was fifty-five years old. AR at 201. Plaintiff testified he had gone only as far as seventh grade in school, but because he "wasn't [the] age to drop out yet," he completed the eighth grade level. *Id.* at 205. However, when the ALJ commented that the record stated Plaintiff completed the eleventh grade, Plaintiff admitted that he attended a continuation high school, and then Fresno High School. *Id.* Plaintiff said he was dyslexic; he could not write well, and did not understand what he read, but "could read a newspaper." *Id.* at 206.

According to Plaintiff, the last time he worked was in 2005 as a chef/cook. AR at 206-207. He explained a "chef runs the kitchen, a sous chef is the second in command, and . . . a cook is line cooking." *Id.* at 207. Plaintiff said he was a line cook for most of his life. *Id.* Plaintiff said he disliked driving and had not held a driver's license since 1974. *Id.* at 209. As a result, he would ride his bike to work. *Id.*

Plaintiff said he lived in an apartment by himself, and had lived there for six months. AR at 207. His income was $800 per month, which came from a worker's compensation claim for an injury to his knee, which had not been settled at the time of the hearing. *Id.* at 207-08, 211.

Plaintiff reported he was receiving medical treatment from UMC and Sequoia Clinic. AR at 210. He said he was last treated at UMC in 2006 and was last treated at Sequoia Clinic in July 2007. *Id.* at 211. Plaintiff said he also had bilateral hernias, but could not get them treated because his diabetes, which was diagnosed in 1998, was not under control. *Id. see also id.* at 216. Plaintiff stated he was "trying" to manage his diabetes: "I'm taking my insulin. . . . [I]t's hard for me to eat on those scales . . . I'm so used to eating what I want to eat." *Id.* at 212. When the ALJ questioned Plaintiff regarding his treatment, pointing to a treatment note that stated "Diet noncompliant, medicine noncompliant," Plaintiff stated it was "very wrong" and that the had been taking his medicine though he had been "wrestling" with this food portions. *Id.* at 213-214. Also, Plaintiff stated he requested a higher dose of insulin, and was given a new kind. *Id.* at 214.

Plaintiff said he had an arthroscopic surgery done on his knee, and it was "as good as it gets." AR at 212, 214. According to Plaintiff, he could not stand for more than three hours, or he would start feeling pain. *Id.* at 214, 216. Plaintiff testified that if he sat "for a long length of time" his knee would start bothering him. *Id.* at 218. As an example, Plaintiff stated he played cards with friends "for a good three hours" and "had to get up . . . [and] stretch [his] leg." *Id.* Plaintiff stated he could not climb stairs, or he would "feel tension." *Id.* at 214. Plaintiff said he could ride a bike "maybe three blocks," before it caused pain in his knee. *Id.* Plaintiff bought a TENS unit for his knee, which he used "like every other day" for about forty minutes, especially when he went on walks. *Id.* at 214-15. Plaintiff estimated he could walk a half a mile without resting or using his TENS unit. *Id.* at 215. Further, Plaintiff believed he could lift and carry "about 15 to 20 pounds" comfortably. *Id.*

Plaintiff stated he took a daily walks " around the block maybe three times" and walk to the grocery story which was about a "half a mile" from where he lived to purchase "necessary . . . or miscellaneous things." AR at 217. In addition, Plaintiff stated that on a typical day he would visit his family members or friends, who could come pick him up to visit. *Id.* When not visiting or cooking for friends and family, Plaintiff stated he would "just be a couch potato, basically. Watch movies and what not." *Id.* at 218-19. Plaintiff said he could do his housework and cleaning. *Id.* at 221.

///

C.   The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff had not engaged in substantial gainful activity since the alleged onset date of August 8, 2005.  AR at 18.  Second, the ALJ found Plaintiff had the following severe impairments: diabetes and bilateral inguinal hernias.  *Id.*  Though Plaintiff also complained of a left knee injury, the ALJ found it was not a severe impairment because it "did not significantly affect his abilities to perform basic work activities for a twelve-month period."  *Id.*  The ALJ concluded that the impairments did not meet or medically equal a listing.  *Id.* at 19.

At the fourth step, the ALJ considered "the entire record" to determine Plaintiff's residual functional capacity ("RFC").  AR at 19.  The ALJ determined Plaintiff had the RFC "to perform the full range of light work."[4]  *Id.*  Plaintiff was not able to perform his past relevant work as a cook, because such work "requires a medium level of physical exertion."  *Id.*  The ALJ found jobs "existed in significant numbers in the national economy that the claimant could perform," prior to November 23, 2006, but after that date there were no jobs Plaintiff could perform.  *Id.* at 19-20.  However, the ALJ noted treatment that was "expected to restore the claimant's capacity to perform substantial gainful activity" was prescribed, but claimant failed to follow the treatment without an acceptable reason.  *Id.* at 20-21.  Therefore, the ALJ concluded Plaintiff was not eligible to receive disability insurance benefits or supplemental security income "due to his failure to follow prescribed treatment."  *Id.* at 21.

## DISCUSSION AND ANALYSIS

Many of Plaintiff's claims are unintelligible.  However, when considering the Complaint and Plaintiff's Opening Brief as a whole, it appears that Plaintiff is asserting that his counsel was ineffective and that the ALJ erred in making certain of the above findings.  Specifically, Plaintiff complains that the ALJ erred when he found that Plaintiff's knee impairment was not severe and when the ALJ determined that Plaintiff was noncompliant with his diabetes treatment.

///

---

[4] Light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  1983 SSR LEXIS 30.  Plaintiff does not challenge the RFC finding.

A. Assistance of Counsel

Initially Plaintiff claims that he received ineffective assistance of counsel. However, there is no constitutional right to assistance of counsel at a social security hearing. *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Clark v. Schweiker*, 652 F.2d 399, 403 (5th Cir. 1981). The Ninth Circuit has held that even the "[l]ack of counsel does not affect the validity of the hearing . . . unless the claimant can demonstrate prejudice or unfairness in the administrative proceedings." *Vidal v. Harris*, 637 F.2d 710, 713 (9th Cir. 1981).

On the other hand, there is no evidence that Plaintiff's attorney, Mr. Witherow, "failed [in] presenting medical reports on the primary injuries that kept [Plaintiff] from performing substantial gainful activity." (Doc. 22 at 7). To the contrary, as detailed above, the administrative record contains reports on Plaintiff's impairments and statements by his various treating physicians regarding those conditions.

Plaintiff alleges that Mr. Witherow did not review the medical records introduced in evidence or discuss them with Plaintiff prior to the hearing. However, the record demonstrates Mr. Witherow's preparedness given that he was the primary interrogator of Plaintiff at the hearing, with the ALJ interjecting questions only when he desired further information. *See* AR at 204-22. Mr. Witherow's examination elicited testimony regarding Plaintiff's medical history, treatment, physical abilities, and daily activities. Likewise, the record demonstrates that, in fact, Mr. Witherow *did* discuss these reports with Plaintiff before the hearing. In referencing the medical reports, Mr. Witherow indicated, "We went over this right before the hearing because I wanted to make sure we have a report from Sequoia." *Id.* at 210-11. Thus, contrary to Plaintiff's assertions, there is no evidence that his attorney's conduct prejudiced him or caused the process to be unfair.

B. ALJ's duty of full inquiry

An ALJ has the duty to perform a full inquiry under 20 C.F.R. § 416.1444: "At the hearing, the [ALJ] looks fully into the issues, questions [the claimant] and the other witnesses, and accepts as evidence any documents that are material to the issues." Consequently, the ALJ is obligated to take reasonable steps to ensure that issues and questions raised by medical evidence are addressed at the hearing for the disability determination to be made on a sufficient record of information, both

favorable and unfavorable to the claimant. *See Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1999). Plaintiff asserts the ALJ erred by asking questions about and relying upon, medical reports used by the Social Security Administration when it denied his claims initially and upon reconsideration. (Doc. 22 at 6-7). However, the ALJ is required to "include all the issues brought out in the initial, reconsidered or revised determination that were not decided entirely in [the claimant's] favor." 20 C.F.R. § 416.1446. As noted by the ALJ, he considered the "entire record" in determining Plaintiff's residual functional capacity. *See* AR at 19. Thus, the ALJ discharged his duty to consider all of Plaintiff's medical history, whether or not it was favorable to Plaintiff or was considered by the Social Security Administration in the prior decisions on his claims.

C.   "Prejudgment" by the ALJ

Plaintiff asserts the "[r]ecords submitted into and considered as evidence . . . set the eye of pre-judgement (sic) of the ALJ at the time of the hearing." (Doc. 22 at 7). In this manner, Plaintiff seems to argue that the ALJ denied him due process or failed in his role as in impartial adjudicator of the administrative hearing.

Due process requires that administrative hearings be conducted by an unbiased adjudicator. *Schwiker v. McClure*, 456 U.S. 188, 195-96 (1982). The impartiality of administrative law judges is "integral to the integrity of the system." *Miles v. Chater*, 84 F.3d 1397, 1401 (11th Cir. 1996). Administrative law judges are presumed to be impartial and unbiased, but the presumption of impartiality can be rebutted by a claimant demonstrating "a conflict of interest or some other specific reason for disqualification." *Id.*; *see also Verduzco v. Apfel*, 188 F.3d 1087, 1098 (9th Cir. 1999). Bias is shown where the ALJ's conduct, in the context of the entire proceeding, is "so extreme as to display clear inability to render fair judgment." *Rollins v. Massanari*, 261 F.3d 853, 857-858 (9th Cir. 2001), citing *Liteky v. United States*, 510 U.S. 540, 551 (1994).

Plaintiff does not make any claims of error regarding the conduct of the ALJ during the hearing. Rather, Plaintiff's sole assertion is that the ALJ had prejudged his case based upon the evidence submitted prior to the hearing. (Doc. 22 at 7). However, the Ninth Circuit has determined that an allegation that the ALJ "prejudged [a] case in some way" is insufficient to show a violation of due process, because the Court could found "no legal authority for the proposition that general

preconceptions that do not amount to bias violate the Due Process Clause." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). The ALJ's decision demonstrates that he considered Plaintiff's testimony regarding his physical abilities, activities, and treatments[5] for his knee, diabetes, and hernias. *See* AR at 18-20. Thus, even if there was "prejudgment" of Plaintiff's claims by the ALJ, there was no violation of due process and Plaintiff was not prejudiced by the preconceptions.

D.  Finding of a "not severe" knee injury

In his complaint, Plaintiff states the ALJ erred because the ALJ "did not center his ruling on the knee injury [though] the knee injury is what [caused him] to be disabled." (Doc. 1 at 1). However, the ALJ made a determination regarding Plaintiff's knee impairment and found that it was "not severe" at step two of his inquiry. *See* AR at 18.

The inquiry at step two for determining whether a claimant suffers from a severe impairment is a *de minimus* screening "to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) citing *Bowen*, 482 U.S. 137, 153-54 (1987). The purpose is to identify claimants whose medical impairment makes it unlikely they would be disabled even if age, education, and experience are considered. *Bowen*, 482 U.S. at 153 (1987). A claimant must make a "threshold showing" that (1) he has a medically determinable impairment or combination of impairments and (2) the impairment or combination of impairments is severe. *Id.* at 146-47; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c). Thus, the burden of proof is on the claimant to establish a medically determinable severe impairment. *Id.*

---

[5] The ALJ found Plaintiff's testimony regarding compliance with treatment to lack credibility "in view of the numerous observations to the contrary in his treatment records." AR at 20. Though unchallenged by Plaintiff, this was a proper credibility finding by the ALJ, who may consider inconsistencies in testimony and unexplained, or inadequately explained, failure to follow a prescribed course of treatment in determining a claimant's credibility. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).

Also, Plaintiff asserts the ALJ erred in his evaluation of the evidence because Plaintiff was treated at Community Medical Center on July 27, 2007, rather than Sequoia Community Health Center as was stated at the hearing. (Doc. 22 at 7). However, this statement was not made by the ALJ and there is no evidence that the ALJ was confused by it. *See* AR 210-11. Regardless, a mistake in identifying the treatment location did not affect the ultimate determination of disability. It was the content of the treatment notes that was probative to the ALJ's conclusion that Plaintiff was not compliant with his treatment rather than the identity of the treatment location. *See id.* at 192 (noting Plaintiff was not compliant with either diet or medication).

Case 1:09-cv-00380-OWW-JLT   Document 26   Filed 03/11/11   Page 13 of 17

An impairment, or combination thereof, is "not severe" only if the evidence establishes that it has "no more than a minimal effect on an individual's ability to do work." *Smolen*, 80 F.3d at 1290. Previously, this Court explained: "A mere recitation of a medical diagnosis does not demonstrate how that condition impacts plaintiff's ability to engage in basic work activities. Put another way, a medical diagnosis does not an impairment make." *Nottoli v. Astrue*, 2011 U.S. Dist. LEXIS 15850, at *8 (E.D. Cal. Feb. 16, 2011); *Huynh v. Astrue*, 2009 U.S. Dist. LEXIS 91015, at *6 (E.D. Cal. Sept. 30, 2009); see also *Matthews v. Shalala*, 10 F.3d 678 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of a disability"). For an impairment to be "severe," it must significantly limit the claimant's physical or mental ability to do basic work activities, or the "abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1520(c), 416.920(c), 416.921(b).

In this case, the ALJ determined Plaintiff's knee injury did not rise to the level of a "severe" impairment. As observed by the ALJ:

> [Plaintiff's] treating physician repeatedly completed records indicating that he was able to perform work duties without restriction (Exhibit 2F, pp. 17, 15, 13, 12, 9, 7). He does not allege inability to work until August 8, 2005 (Exhibit 1E, p. 2) over 15 months after the knee injury. Further, a treatment record dated August 16, 2005 states "He wants to go on disability now and schedule herniorrhaphy when his sugar is under control" without any reference to a knee problem (Exhibit 1F, p. 2).[6]

AR at 18. In addition, the ALJ noted the minimal findings from Plaintiff's MRI from December 2005, and that Dr. Esposito's "most recent physical examination of the claimant is nearly normal." *Id.* Plaintiff's range of motion in his left knee was 5 to 125 degrees, and he had "mild focal tenderness." *Id.*; *see also* AR at 183. The ALJ supported his findings that Plaintiff's knee injury was not severe with objective medical evidence, and ALJ concluded properly that Plaintiff's knee

---

[6] Plaintiff argues "[E]xhibit-2F/ Pages 1-21 were not used on the decision," which constituted an error by the ALJ. (Doc. 22 at 5). However, as demonstrated by the page numbers cited by the ALJ indicating Plaintiff could perform regular work duties, this assertion is incorrect.

injury "did not significantly affect his abilities to perform basic work activities." *Id.* at 18; *see Smolen*, 80 F.3d at 1290. Thus, the ALJ did not err in evaluating Plaintiff's knee impairment.[7]

E. Plaintiff's noncompliance with treatment

An impairment that can be controlled by treatment or medication is not considered disabling. *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006). Under the regulations of the Social Security Administration, a claimant is cautioned: "In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work." 20 C.F.R. §§ 404.1530(a), 416.930(a). If a claimant fails to follow the prescribed treatment without an acceptable reason, the Commissioner "will not find [the claimant] disabled." 20 C.F.R. §§ 404.1530(b), 416.930(b); *see also Orn v. Astrue*, 495 F.3d 625, 636-37 (9th Cir. 2007). The purpose of requiring compliance with treatment "is not to punish minor lapses, but to ensure that claimants do what they can to restore capacity." *Alcantara v. Astrue*, 257 Fed. App'x. 333, 335 (1st Cir. 2007).

When evaluating a claimant's non-compliance with treatment, physical, mental, educational, and linguistic limitations are to be considered. 20 C.F.R. §§ 404.1530(c), 416.930(c). In addition, the policy of the Social Security Administration dictates that to find an individual has failed to follow prescribed treatment such to preclude benefits, the following conditions must exist:

> 1. The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA) . . . ; and
>
> 2. The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and
>
> 3. Treatment which is clearly expected to restore capacity to engage in any SGA . . . has been prescribed by a treating source; and
>
> 4. The evidence of record discloses that there has been a refusal to follow prescribed treatment.

---

[7] Notably, even if the Court were to find the ALJ erred in finding Plaintiff's knee impairment was "not severe" at step two, any error in designating specific impairments as severe at step two is harmless. *See Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005) (holding that any error in omitting an impairment from the severe impairments identified at step two was harmless where the step was resolved in the claimant's favor). Here, because the ALJ found diabetes and bilateral inguinal hernias, step two was resolved in Plaintiff's favor. Moreover, the ALJ considered the physical limitations of Plaintiff's knee impairment in his determination that Plaintiff could perform light work. *See* AR at 19. Thus, there was no prejudice to Plaintiff at step two.

14

Social Security Ruling ("SSR") 82-59, 1982 SSR LEXIS 25.[8]

The ALJ determined that after November 23, 2006, there were no jobs Plaintiff could perform in the national economy. AR at 20. The ALJ noted Plaintiff "stopped working on August 8, 2005 because his doctor advised him to take off for a while and have surgery." *Id.*, citing AR at 85. Thus, the first condition was met. Further, several medical records indicated Plaintiff should have surgery to repair his inguinal hernias. AR at 20. The ALJ concluded "claimant's treating physician intended for the claimant to have surgery which was expected to permit him to return to his past relevant work as a cook." *Id.* Thus, the second and third conditions were met. Finally, the ALJ found a number of records demonstrated that Plaintiff was not complaint with the prescribed treatment for his diabetes:

> [Plaintiff] told the consultative internal medicine examiner in November 2005 that he was not on any medication for diabetes [citation]. Records from University Medical Center dated January 19, 2006 indicate "currently not taking medications/checking blood glucose" and reiterate that they "need good BG (blood glucose) control prior to surgery" [citation]. Another record from Sequoia Community Health Centers dated May 30, 2006 notes that the claimant "has not been using insulin" [citation]. An August 15, 2006 progress note from Sequoia Community Health Centers indicates "poor compliance" [citation]. On October 9, 2006, it was again noted that the claimant would not be scheduled for surgery until his blood sugar was controlled and he needed to follow-up with a dietitian [citation]. On December 19, 2006 he did not keep his appointment with a "diabetic educator" [citation].

AR at 20 (internal citations omitted). In addition, the ALJ noted that Plaintiff's most recent treatment note, from July 2007 when he was evaluated for hernia surgery, states Plaintiff "was still non-complaint with both diet and medication." *Id.* Consequently, each of the above factors was met by Plaintiff's failure to follow his prescribed treatment and control his diabetes.

SSR 82-59 states a claimant "should be given the opportunity to fully express the specific reason(s) for not following the prescribed treatment." 1982 SSR LEXIS 25. Examples of "acceptable reasons" for failure to follow a prescribed treatment include: a treatment being contrary to the claimant's religious beliefs; a surgery is recommended though that same surgery yielded unsuccessful results on a previous occasion; an unusual or very risky operation, such as an organ

---

[8] Social Security Rulings are issued by the Commissioner to clarify regulations and policies. Though they do not have the force of law, the Ninth Circuit gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

transplant; or the amputation of an extremity.  20 C.F.R. §§ 404.1530(c), 416.930(c).  At the hearing, the ALJ asked Plaintiff to explain why the doctor noted: "Diet noncompliant, medicine noncompliant."  AR at 213.  Plaintiff responded that the note was "very wrong."  *Id.*  Upon further questioning by counsel, Plaintiff stated he had been "wrestling" with his portions and but had been taking his insulin.  *Id.*

The ALJ determined Plaintiff's reason for noncompliance  was "not comparable to any of the examples of good reasons for not following treatment set forth in the regulations."  AR at 21.  Notably, the lack of self-discipline is not an acceptable reason for failing to follow the prescribed treatment.  *See Osenbrock v. Apfel*, 240 F.3d 1157, 1162, 1167 (9th Cir. 2001); *see also Ambrose v. Astrue*, 2010 U.S. Dist. LEXIS 97021, at *21 (N.D. Cal. Sept. 16, 2010) (claimant's failure to comply with diabetes treatment was a "life-style choice").  Furthermore, the ALJ determined Plaintiff did not have "physical, mental, educational, or linguistic limitations" that would justify the failure to follow his prescribed treatment.  *Id.* at 21.  Thus, the ALJ properly concluded Plaintiff's failure to follow treatment was not justifiable.

## CONCLUSION

For all these reasons, the Court concludes Plaintiff's contentions of errors at the hearing by counsel and the ALJ were without merit.  Furthermore, the ALJ supported his decision that Plaintiff's knee impairment was not severe with objective medical evidence.  Proper legal standards were applied by the ALJ in his determination that Plaintiff is not disabled within the meaning of the Social Security Act, because Plaintiff failed to comply with treatment that was expected to restore his capacity to perform substantial gainful activity.

Accordingly, **IT IS HEREBY RECOMMENDED**:

1. Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be **DENIED**; and
2. Defendant's motion for summary judgment be **GRANTED**.

These Findings and Recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within

FOURTEEN (14) days after being served with these Findings and Recommendations, any party may file written objections with the court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **March 11, 2011**                               **/s/ Jennifer L. Thurston**
                                                          UNITED STATES MAGISTRATE JUDGE